

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 22, 2023**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **New York Inn Inc. d/b/a Viva Inn Motel** | § § § | **Case No. 21-30958-mvl11** |
| Debtor. | § § | |
| | § | |
| **New York Inn Inc. d/b/a Viva Inn Motel, and Viva Inn, Inc.** | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | **Adv. Pro. No. 22-03037** |
| **Associated Industries Insurance Company, Inc.** | § § § | |
| Defendant. | § § | |

### REPORT AND RECOMMENDATION TO DISTRICT COURT REGARDING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] is Defendant Associated Industries Insurance Company, Inc.'s ("**AIIC**" or the "**Defendant**") *Motion for Summary Judgment and Brief in Support* (the "**MSJ**" or the "**Motion**") [ECF No. 72] filed on December 30, 2022. AIIC seeks summary judgment declaring that no genuine issues exist for trial and dismissing the *Amended Complaint* (the "**Amended Complaint**") filed by Plaintiffs New York Inn, Inc. (the "**Debtor**" or "**New York Inn**") and Viva Inn, Inc. ("**Viva Inn**," and, together with New York Inn, the "**Plaintiffs**") [ECF No. 49] on November 1, 2022.[2] By the Amended Complaint, Viva Inn asserts certain causes of action under an insurance policy (the "**Policy**") for property damage to a hotel (the "**Property**"), damage to the contents of the Property,[3] and the resulting business interruption caused by the February 2021 Texas freeze event.[4] For the reasons that follow, the Court respectfully recommends to the District Court that Defendant's Motion should be **GRANTED** in its entirety.

## I.    JURISDICTION AND VENUE.

The District Court has subject matter jurisdiction over the Adversary Proceeding under 28 U.S.C. § 1334.  28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority

---

[1] For the purposes of this report and recommendation, all capitalized references to the Court (the "**Court**") are made in reference to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Likewise, all capitalized references to the District Court (the "**District Court**") are made in reference to the United States District Court for the Northern District of Texas, Dallas Division. All capitalized references to the Bankruptcy Case (the "**Bankruptcy Case**") are made in reference to Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021). All capitalized references to the Adversary Proceeding (the "**Adversary Proceeding**") are made in reference to Adv. Pro. No. 22-03037-MVL (Bankr. N.D. Tex. 2022).

[2] The Court notes that while the Plaintiffs jointly filed the Amended Complaint, New York Inn has since been dismissed as a plaintiff in the Adversary Proceeding for lack of standing. *See* ECF No. 106. However, the Court's order dismissing New York Inn as a plaintiff has since been appealed to the District Court, where the matter is currently pending. *See* ECF No. 114. As such, capitalized references to the Plaintiff (the "**Plaintiff**") are hereinafter made in reference to Viva Inn, specifically.

[3] The Court will note that the Amended Complaint refers to a $10,000.00 advance provided for "contents loss," and both Plaintiff and Defendant (the "**Parties**") subsequently refer to "contents" or the "contents loss" throughout their pleadings and communications with each other. However, the Policy does not define the term, "contents." The Policy's "Building and Personal Property Form" defines "Covered Property" as either "(a.) Building, or (b.) Your Business Personal Property." The Policy's limit for recovery on "Building Personal Property" is $175,000.00, which is the same as the limit each party refers to for "contents loss" throughout their pleadings, and it is the only limit with such an amount within the Policy and coverages provided. Therefore, the Court will proceed with the understanding that Plaintiff's claim for "contents loss" is governed by the "Business Personal Property" coverage provision.

[4] *See* ECF No. 49.

conferred" upon the district courts.  Under 28 U.S.C. § 157, district courts may refer bankruptcy cases and proceedings to bankruptcy courts for either entry of a final judgment in "core" proceedings or, absent consent of the parties, proposed findings and conclusions in "non-core, related to" proceedings. This matter is not a core proceeding and the Court lacks authority to enter a final order. Likewise, the Defendant did not consent to this Court's entry of final orders. Accordingly, this report and recommendation shall constitute the proposed findings and conclusions of the United States Bankruptcy Court for the Northern District of Texas with respect to the Motion.

## II.   UNDISPUTED FACTS.

On August 9, 2020, Viva Inn's principal, Mr. Dharmesh Patel ("**Mr. Patel**") purchased property, business interruption, and commercial liability insurance from AIIC on behalf of Viva Inn, as evidenced by the Policy.[5] On February 27, 2021, Viva Inn's public adjuster, Mr. Kevin Small, sent a letter of representation to AIIC and reported a claim for water damage to the Property resulting from pipes freezing and bursting on February 17, 2021 (the "**Freeze Claim**").[6] AIIC acknowledged receipt of the claim in a letter on March 2, 2021.[7] AIIC retained an independent adjusting firm, Sedgwick ("**Sedgwick**"), to assist in the investigation of the Freeze Claim, who in turn assigned the claim to an independent adjuster, Shaun Keefer. Mr. Keefer inspected the Property with a representative of Mr. Small's office on March 16, 2021.[8] Sedgwick provided AIIC with a report on March 19, 2021, recommending payment of the undisputed actual cash value ("**ACV**") amount of the loss to the Property, which Sedgwick estimated as $153,961.57.[9]

---

[5] *See* ECF No. 72-1, pp. 17, 21, and 23.
[6] *Id*. at 221.
[7] *Id*. at 222.
[8] *Id.* at 2.
[9] *Id.* at 2–3.

Sedgwick also estimated that repairs would take about two months on the Property and replacement cost value ("**RCV**") of repairs would total $175,256.42.[10]

On March 30, 2021, AIIC sent a letter to Viva Inn saying that it had approved a payment in the amount of $153,961.57.[11] In its letter, AIIC advised Viva Inn to submit invoices and other documents demonstrating the cost of repairs completed if Viva Inn wished to make a claim for RCV coverage.[12] On April 6, 2021, Ms. Christine Rozzelle of AIIC e-mailed Mr. Small, advising him that the Freeze Claim had been reassigned to her.[13] Mr. Small replied the same day, requesting an advance payment for Viva Inn's business interruption loss.[14]

The next day, April 7, 2021, Ms. Rozzelle replied that AIIC would consider an advance payment towards business interruption, but would require some documentation to determine the amount of the lost income.[15] Specifically, Ms. Rozzelle requested three months of Viva Inn's profit and loss statements so that AIIC's accountant could determine the average income and expenses on which to base its advance payment amount.[16] In the same e-mail, Ms. Rozzelle requested an update on water mitigation with invoices for any mitigation services performed and an inventory of the damaged contents.[17] Ms. Rozzelle informed Mr. Small that AIIC was denying a request by Viva Inn to approve a proposal for moisture mapping on the basis that it was an excessive cost that would simply delay the water mitigation process.[18] Given it was six weeks after the freeze, she further mentioned that if water mitigation had yet to commence on the Property and additional damages resulted because of the delay, such damage may not be covered because the Policy

---

[10] *Id.*
[11] *Id.* at 297–98.
[12] *Id.*
[13] *Id.* at 7, 300.
[14] *Id.* at 299–300.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 301–05.
[18] *Id.* at 301.

required the insured to take all reasonable steps to protect the Property from further damage after an incident of insurable loss.[19] Ms. Rozzelle even went so far as to "strongly suggest that [Viva Inn] have a qualified mitigation contractor come out to begin the drying process immediately," in order to forestall any further damage.[20]

AIIC's accountant, Brandon Adams (the "**Accountant**"), sent a separate e-mail to Mr. Small on April 7, 2021, requesting further documents and information he felt was necessary to calculate the business interruption loss.[21] This request included lists of refunds to customers, occupancy records, detailed monthly profit and loss statements from January 2020 to the present, and payroll records.[22] The only document Mr. Small forwarded to the Accountant to support Viva Inn's business interruption claim was a profit and loss statement (the "**P&L Statement**") which purportedly represented Viva Inn's profits and losses from October 2020 through December 2020.[23] Based on the P&L Statement, the Accountant prepared a preliminary estimate of the business interruption loss from February 17, 2021 to May 31, 2021, which totaled $74,295.00.[24] Using that figure, Ms. Rozzelle calculated a business interruption payment of $26,349.81, based upon which AIIC issued payment to Viva Inn.[25] No further documentation or any supporting information for the figures in the P&L Statement was ever forwarded to the Accountant in connection with the business interruption claim.[26]

On October 21, 2021, Ms. Rozzelle sent a letter to Viva Inn explaining that AIIC would issue payment of $26,349.81 despite receiving no further documentation of business interruption.[27]

---

[19] *Id.* at 301–02.
[20] *Id.* at 302.
[21] *Id.* at 306–07.
[22] *Id.*
[23] *Id.* at 324.
[24] *Id.* at 320.
[25] *Id.* at 308.
[26] *Id.* at 8.
[27] *Id.* at 308–311.

In the same letter, Ms. Rozzelle explained that AIIC had approved a $10,000.00 advance payment

for contents  (hereinafter referred to as "**Contents**")  based solely on AIIC's initial inspection, and

that no further payments would be issued "unless and until a full inventory of all damaged contents

is submitted including a description of the items, quantity of each damaged item, age of the items,

and the current replacement cost of the items."[28] The letter included a contents worksheet for Viva

Inn to complete in case it wished to submit an inventory for further Contents coverage.[29]

Coverage for the damaged Contents of the Property is governed by the Policy's "Building

and Personal Property Coverage Form," which provides that the insurer will pay for "direct

physical loss of or damage to Your Business Personal Property," under Section A(1)(b).[30] Notably,

the Policy states that claims for Contents are valued on an ACV basis, which means that the

replacement cost provision (the "Replacement Cost Provision") does not apply, and Contents are

to be valued as of the time of loss or damage.

On October 25, 2021, Decagon Development Company, Inc. ("**Decagon**"), owned by

Roger Pate ("**Mr. Pate**"), prepared an estimate for the cost of repairing the Property, accompanied

by a draw schedule.[31] On November 17, 2021, Viva Inn's affiliate, New York Inn, filed the

*Debtor's Motion for Approval to Enter Into Renovation Contract and Use Cash Collateral to*

*Perform Renovations* (the "**Cash Collateral Motion**") in the Bankruptcy Case seeking approval

of a contract for "renovations and repairs" of the Property totaling $889,570.00.[32] Notably, New

York Inn stated that it "believe[d] that additional insurance proceeds in the amount of at least

---

[28] *Id.*

[29] *Id.*

[30] Section A(1)(b) covers property such as furniture, fixtures, machinery and equipment, stock, and all other personal property owned by the insured and used in its business. *See* ECF No. 72-1, p. 115.

[31] *See* ECF No. 81-1, pp. 1–4.

[32] *See* ECF No. 61, Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021). The issue of Viva Inn, rather than New York Inn, being the holder of the Policy did not arise until later, in the Adversary Proceeding.

$426,733.00 are due from [AIIC]."[33] On January 25, 2022, the Court held a hearing on the Cash Collateral Motion.[34] At the hearing, Mr. Pate testified that Decagon's only source of payment would be from insurance proceeds. Decagon had no expectation of recovery from New York Inn, the Debtor. The Court granted the motion on the basis that it was unopposed, but imposed the agreed-upon condition that Decagon would only be paid out of the insurance proceeds from the Property.[35]

On November 22, 2021, AIIC received a presuit notice and demand letter from Viva Inn's legal counsel.[36] The letter contained an estimate of the claim, adjusted by Mr. Small, which stated that the total for all repairs to the Property should cost $580,689.18.[37] AIIC then retained legal counsel, who responded to Viva Inn's letter on December 21, 2021, stating that AIIC had not before seen the Mutual Group's estimate and requesting "a re-inspection of the property as provided by statute and the policy."[38] AIIC's legal counsel retained Joshua Ziegler with Cavalry Construction ("**Cavalry**") to reinspect the Property, hoping to determine both the status of repairs and whether additional amounts were owed for RCV.[39] Cavalry conducted an inspection of the Property on January 13, 2022,[40] then prepared a separate, independent estimate for the cost of repairs, which Cavalry estimated at $236,188.84, without accounting for Contents.[41] At the time of the reinspection, and for months afterward, the repairs to the Property were not yet completed.[42]

---

[33] *Id.* at 3, ¶ 7.

[34] *See* ECF No. 75, Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021).

[35] *See id.*; *see also* ECF No. 82, p. 3, Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021) ("Decagon Development Company, Inc. will only be paid from insurance proceeds.").

[36] *See* ECF No. 72-1, p. 8; *see also* ECF No. 81-1, pp. 11–13.

[37] *See* ECF No. 81-1, p. 11; *see also* ECF No. 81-3, p. 178.

[38] ECF No. 81-3, p. 182.

[39] *See* ECF No. 72-1, p. 8; *see also* ECF No. 81-3, pp. 182–83.

[40] ECF No. 72-1, p. 331.

[41] *Id.* at 331–76.

[42] The Court conducted three hearings over the course of several months on New York Inn's Cash Collateral Motion and on New York Inn's pending Chapter 11 Plan in the Bankruptcy Case. The hearings took place on January 25, 2022, March 29, 2022, and May 17, 2022. At each of those hearings, counsel for New York Inn represented to the

On April 1, 2022, New York Inn filed the *Original Complaint* (the "**Original Complaint**"), which commenced the above-captioned Adversary Proceeding.[43] After commencement of the Adversary Proceeding, on June 16, 2022, Plaintiffs' legal counsel submitted invoices to AIIC for the repair work performed by Decagon, along with a request for payment of the difference between the initial ACV payment and the amounts incurred by Decagon.[44] In the e-mail exchange between the Parties' legal counsel following this submission, AIIC requested the ability to reinspect the Property once more to ensure that repairs had been substantially completed, stating that it would need more detailed information regarding the amounts charged and scope of work for Decagon's invoices in order for AIIC to approve any payment above the Cavalry RCV estimate.[45] In the meantime, AIIC offered to issue payment of $81,227.27, representing the difference between the initial ACV payment that Viva Inn received and the Cavalry RCV estimate.[46] Cavalry's adjuster conducted a second walk-through inspection of the Property on July 11, 2022, determining that repairs to the Property were substantially complete.[47] Payment in the amount of $81,227.27 was issued on July 22, 2022, and Viva Inn's legal counsel accepted the payment on its behalf.[48]

## III.    CURRENT PROCEDURAL POSTURE.

This Adversary Proceeding commenced on April 1, 2022, when New York Inn filed its Original Complaint, listing as defendants Amtrust Financial Services, Inc., Amtrust Insurance Company, and AIIC. On June 14, 2022, AIIC filed the *Defendants' 12(c) Motion to Dismiss and Brief in Support* (the "**Original 12(c) Motion**"), seeking to dismiss Amtrust Financial Services,

---

Court that the repairs were ongoing and had not been completed. *See, e.g.,* ECF Nos. 76, 87, and 94, Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021).
[43] ECF No. 1
[44] *See* ECF No. 72-1, pp. 137–39.
[45] *See* ECF No. 81-3, pp. 192–93.
[46] *Id.* at 184–195.
[47] ECF No. 72-1, p. 9.
[48] *See* ECF No. 72-1, p. 321; ECF No. 81-3, p. 209.

Inc. and Amtrust Insurance Company as those parties were not properly parties to the Policy.[49]

AIIC also requested that the Court dismiss the Adversary Proceeding because New York Inn, the

then sole plaintiff, did not have standing to bring the claims in the Original Complaint.[50] The Court

granted AIIC's Original 12(c) Motion without prejudice to refiling.[51] In its order granting the

Original 12(c) Motion, the Court noted that Viva Inn was the only named insured on the Policy,

and that New York Inn was only listed as an additional insured as to general commercial liability

coverage, and not as to property coverage.[52] The Court also noted that counsel for New York Inn

conceded that (i) Viva Inn should be added as a plaintiff to the Adversary Proceeding, and (ii)

Amtrust Financial Services Inc. and Amtrust Insurance Company were not the proper

defendants.[53]

The Plaintiffs filed an Amended Complaint on November 1, 2022, listing Viva Inn as a

Plaintiff for the first time in this Adversary Proceeding. On November 15, 2022, the Defendant

filed its *Answer to Amended Complaint*.[54] On November 22, 2022, the Court held a hearing on the

*Defendant Associated Industries Insurance Company's Motion to Compel Non-Party Roger Pate*

*to Produce Documents in Response to Subpoena Duces Tecum* (the "**Motion to Compel**").[55] At

the hearing, Mr. Pate testified that although he had been served with a subpoena *duces tecum*, he

was unable to produce the requested invoices, receipts, and business records for his deposition.

Mr. Pate testified that he later gave the subpoenaed documents to Mr. Patel, but Mr. Patel testified

that the documents had been stolen from his car. Mr. Pate was unable to testify at the hearing in

any detail about his vendors, subcontractors, or the scope of work performed by any individual.

---

[49] *See* ECF No. 17.
[50] *Id.*
[51] *See* ECF No. 35.
[52] *Id.* at 3–4.
[53] *Id.* at 4.
[54] ECF No. 52.
[55] ECF No. 45.

Thereafter, the Court issued an order (the "**Order on the Motion to Compel**") requiring Mr. Pate and Decagon to turn over to AIIC all business records relevant to the subpoena that he had in his possession, including a list of every subcontractor (and sub-subcontractor) that worked on the repair and renovation of the Property. Mr. Pate was further ordered to work with all financial institutions, sub or sub-subcontractors and vendors to recreate any missing records relevant to the subpoena. The Plaintiffs were also ordered to produce all non-privileged documents in each of their possession relative to the repair and renovation of the Property.[56]

On December 9, 2022, the Defendant filed a second *Defendant's 12(c) Motion to Dismiss and Brief in Support* (the "**Motion to Dismiss**"),[57] seeking dismissal of New York Inn as a plaintiff in the Adversary Proceeding for lack of standing to allege the causes of action in the Amended Complaint, as well as dismissal of the Plaintiffs' cause of action for declaratory judgment. The Court heard oral arguments on the Motion to Dismiss and took the matter under advisement.

On December 30, 2023, AIIC filed the instant Motion, seeking summary judgment declaring that no genuine issues exist for trial and dismissing the Amended Complaint in its entirety. On January 20, 2023, the Plaintiffs filed their *Response to AIIC's Motion for Summary Judgment with Brief in Support* (the "**Response**").[58] On February 3, 2023, the Defendant filed a *Reply to Plaintiffs' Response to Motion for Summary Judgment and Brief in Support* (the "**Reply**").[59] On February 7, 2023, without leave of the Court, and notably without first conferring with opposing counsel, the Plaintiffs filed a *Surreply to AIIC's Motion for Summary Judgment with Brief in Support* (the "**Surreply**")[60] in contravention of the Court's local rules.[61] The Surreply

---

[56] *See* ECF No. 58.
[57] ECF No. 65.
[58] ECF No. 81.
[59] ECF No. 90.
[60] ECF No. 92.
[61] L.B.R. 7056-1 governs motion practice for summary judgment before the United States Bankruptcy Court for the Northern District of Texas, and the rule does not contemplate the filing of sur-replies. Further, L.B.R. 7056-1(g)

also contained an exhibit referencing evidence not previously contained in the summary judgment record.[62]

On the same day, AIIC filed its *Objections and Motions to Strike Portions of the Declarations of Danny Patel, Roger Pate, and Jules Slim from the Summary Judgment Record and Brief in Support* [ECF No. 91] (the "**Motion to Strike Declarations**"). On February 20, 2023, AIIC filed a *Motion to Strike Plaintiffs' Surreply to Reply to Response to Motion for Summary Judgment and Brief in Support* [ECF No. 97] (the "**Motion to Strike the Surreply**"). The next day, the Plaintiffs filed a *Response to AIIC's Motion to Strike Certain Declaration Testimony of Danny Patel, Roger Pate, and Jules Slim* [ECF No. 98] (the "**Response to Motion to Strike Declarations**").

On February 27, 2023, the Court held a hearing on the MSJ, the Motion to Strike the Surreply, and the Motion to Strike Declarations. Counsel appeared for the Plaintiff and the Defendant, the Court heard oral arguments on each matter, and the Court took the MSJ under advisement. At the hearing, the Court orally granted the Motion to Strike the Surreply for several reasons and did not consider that filing in the course of analyzing the MSJ.[63] The Court next orally denied the Defendant's Motion to Strike Declarations. Defendant argued that portions of the declarations of Roger Pate and Danny Patel should be stricken from the summary judgment record to the extent those portions were not provided in the Plaintiffs' Rule 26(a)[64] disclosures. The Court

---

provides, "[e]xcept for the motions, responses, replies, briefs, and appendixes required by these rules, a party may not, without the permission of the Presiding Judge, file supplemental pleadings, briefs, authorities, or evidence."

[62] *See* ECF No. 92-1.

[63] The Court's oral ruling noted that a surreply was not warranted, because no new argument was advanced in the Reply which would have necessitated any response from the non-movant. Second, the Surreply was filed without leave of the Court in contravention of the Court's local rules, without conference, and it referred to evidence not previously contained in the summary judgment record.

[64] Hereinafter, any capitalized reference to a Rule or Rules ("**Rule**" or the "**Rules**") shall be made solely in reference to the Federal Rules of Civil Procedure. Likewise, any capitalized reference to a Bankruptcy Rule or the Bankruptcy Rules ("**Bankruptcy Rule**" or the "**Bankruptcy Rules**") shall be made exclusively in reference to the Federal Rules of Bankruptcy Procedure.

considered the legal standard for failure to disclose under Rule 37(c)(1) and the factors discussed by the Fifth Circuit in *Tex. A&M Research Found. v. Magna Trans., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003), and ultimately found that the Motion to Strike Declarations should be denied.[65]

On April 13, 2023, the Court issued its *Order Granting Defendant's Motion to Dismiss* (the "**Dismissal Order**"), therein dismissing New York Inn as a plaintiff, primarily based on the fact that it was not a party to the property coverage portion of the Policy.[66] That order has since been appealed to the District Court, where the matter is pending, before the Honorable A. Joe Fish, Case No. 3:23-cv-00878-M.[67]

On April 25, 2023, the Court conducted a status conference pursuant to 11 U.S.C. § 105(d) and L.B.R. 5011-1 to discuss whether the Adversary Proceeding should continue before the Court given that it is entirely based on non-core insurance claims governed by state law and the Debtor in the Bankruptcy Case, New York Inn, was no longer a party thereto. Counsel for both Parties appeared and agreed that they wished for the Adversary Proceeding to continue to be heard before the Court on the basis that the Court retained "related to" jurisdiction over the matter. Further, the Parties agreed that they wished the Court to hear all pre-trial matters, submitting reports and recommendations to the District Court on pending dispositive motions such as the MSJ.

Pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011, given that the Court lacked authority to enter final orders, but no party sought to withdraw the reference, the Court submitted a report and recommendation to the United States District Court *sua sponte* recommending that

---

[65] The Court will also note that the Defendant made arguments that portions of the declarations should be stricken from the summary judgment record for failure to meet the Rule 56(c) standard for declaratory statements. *See* ECF No. 91, pp. 7–10. The Court noted in the oral ruling that on reviewing the statements, the Court did not feel the statements were of a nature that would warrant being stricken from the record under Rule 56(c). Instead, the Court pointed out that if it were to find any statement that contradicted a declarant's prior sworn testimony, the Court would address such inconsistency in its report and recommendation on the MSJ. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

[66] *See* ECF No. 106.

[67] ECF No. 114.

the District Court withdraw the reference in this Adversary Proceeding, but only at such time as the Court certifies to the District Court that the litigation is trial-ready. The Court's report and recommendation for withdrawal of the reference was entered in the Adversary Proceeding and transmitted to the District Court on June 15, 2023, where it is currently pending before the Honorable Ada Brown, Case No. 3:23-cv-01342-E.[68]

## IV.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[69] Rule 56(c) mandates the entry of summary judgment where, after adequate time for discovery, a plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party bears the burden of proof at trial.[70] In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[71]

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," it believes demonstrate the absence of a genuine issue of material fact.[72] When the moving party has carried its burden under Rule 56(c), its opponent must do more than "simply show that there is some metaphysical

---

[68] *See* ECF Nos. 156–58.
[69] *See* FED. R. CIV. P. 56, as made applicable by FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[70] *Celotex*, 477 U.S. at 322.
[71] *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[72] *Celotex*, 477 U.S. at 323.

doubt as to the material facts."[73] Only where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party is there no "genuine issue for trial."[74]

## V.    LEGAL ANALYSIS.

### A.  Breach of Contract

Plaintiff Viva Inn claims that AIIC breached its contract by failing to pay Viva Inn's claim

in full and on time with regard to three specific areas of coverage: building repair, contents loss,

and business interruption.[75] AIIC retorts that it issued payments under the corresponding

provisions in compliance with the terms of the Policy and applicable law.[76] AIIC further argues

that Viva Inn is mistaken about its responsibilities under the Policy, and that Plaintiff has failed

multiple times to comply with the Policy's prerequisites for further payment.[77] As a result of the

Plaintiff's failure to supply the information required by the Policy to warrant further payment,

AIIC believes that Plaintiff has no evidence demonstrating that AIIC owes any more than it has

already paid on the Freeze Claim, and that the Plaintiff's claim for breach of contract should be

denied as a matter of law.[78]

Under Texas law, to prevail on a claim for breach of contract, a plaintiff must prove (1) the

existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach

of the contract by the defendant, and (4) damages sustained as a result of the breach. *United

Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F.Supp.3d 584, 593 (S.D. Tex. 2015), aff'd 624

Fed. App'x 225 (5th Cir. 2015) (per curiam) (citing *Mullins v. TestAmerica, Inc.*, 564 F.3d 386,

418 (5th Cir. 2009)). In any insurance action, "[a]n insured cannot recover under an insurance

---

[73] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).
[74] *Scott v. Harris*, 550 U.S. 372, 380 (2007).
[75] *See, e.g.,* ECF No. 49, pp. 4, 5, 9, and 11–14; *see also* ECF No. 81, pp. 3–4, 9–10, 28–31.
[76] *See* ECF No. 72, p. 18; *see also* ECF No. 90, pp. 7–16.
[77] *See* ECF No. 90, pp. 7–16.
[78] *Id.*

policy unless facts are pleaded and proved showing that damages are covered by his policy." *Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 400 (Tex. 2016) (*citing to Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *overruled on other grounds, State Farm Fire & Cas. v. Gandy*, 925 S.W.2d 696 (Tex. 1996)). Specifically, the insured has the burden to prove that its claim falls within the insuring agreement of the policy. The insurer's duty to provide coverage is triggered by the actual facts establishing liability in the underlying suit. *United Neurology,* 101 F.Supp.3d at 593 (*citing Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909 (5th Cir. 1997)).

In Texas, insurance policies are construed under the typical principles of contract law. *See American States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998). Courts construing insurance contracts strive to effectuate the intentions of the parties as they are expressed in the contract. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). The terms of a contract are given their plain, ordinary, generally accepted meaning unless the contract itself redefines those terms or indicates that the parties used the terms in a technical or different sense. *See Bituminous Cas. Corp. v. Maxey*, (Tex. App.– Houston [1st Dist.] 2003, pet. denied) (*citing W. Reserve Life Ins. v. Meadows*, 261 S.W.2d 554, 557 (Tex. 1953)). If the policy language is unambiguous, it must be enforced as written. *See Upshaw v. Trinity Comps.*, 842 S.W.2d 631, 633 (Tex. 1992). However, if the language can be given two or more reasonable interpretations, the construction which affords coverage must be adopted. *See Central Mut. Ins. Co. v. White Stone Properties, Ltd.*, No. A–12–CA–275–SS, 2014 WL 1092121 at *5 (W.D. Tex. Mar. 19, 2014) (*citing Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977)); *see also Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000).

1.  Building Repair

The section of the Policy that controls Plaintiff's claim for damage to the structure of the Property ("**Building Repair**") is the "Building and Personal Property Coverage Form."[79] Claims for Building Repair are paid on an ACV basis unless a claim is made on an RCV basis, which is subject to the requirements of the replacement cost provision (the "**Replacement Cost Provision**"). The Replacement Cost Provision, which is section G(3)(a), (c) of the Policy, provides:

> **3.** Replacement Cost
>> **a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form. …
>
>> **c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.[80]

This language is clear and unambiguous, and courts have routinely enforced similar provisions for RCV coverage. *See Central Mut. Ins. Co.*, 2014 WL 1092121 at *6; *O'Quinn v. General Star Indem. Co.*, No. 1:13–CV–471, 2014 WL 3974315 at *6 (E.D. Tex. Aug. 5, 2014); *Ghoman v. New Hampshire Ins. Co.*, 159 F.Supp.2d 928, 932 (N.D. Tex. 2001) (Kaplan, J.). Generally, these claims function as a two-step process whereby an insured may make a claim for ACV "to begin the process of repair or replacement, at which point [the insured] could submit claims for expenditures that went above the [ACV] of the loss." *Ghoman*, 159 F.Supp.2d at 933.

The summary judgment evidence demonstrates that Viva Inn, which was covered by replacement cost insurance, submitted a claim for water damage to the Property through its public

---

[79] ECF No. 72-1, pp. 115–131.
[80] ECF No. 72-1, p. 129.

adjuster, Mr. Small, on February 27, 2021.[81] AIIC acknowledged receipt of the Freeze Claim just

days later on March 2, 2021.[82] On March 19, 2021, AIIC obtained a report from Sedgwick

recommending payment of the undisputed ACV amount for the loss sustained on the Property

totaling $153,961.57.[83] Sedgwick estimated the RCV of repairs to be $175,256.42.[84] AIIC sent a

letter to Viva Inn on March 30, 2021, explaining that AIIC had completed its initial investigation

and that payment in the amount of $153,961.57 was being issued to Viva Inn.[85] AIIC's letter also

mentioned that Viva Inn could make a claim under the Replacement Cost Provision, and explained

the steps for doing so under the Policy.[86] Notably, the letter also mentions certain limitations on

such claims, warning Viva Inn about potential liabilities for failure to comply with the

requirements of the Policy, saying:

> It is your responsibility to make sure that the covered damages are repaired properly
> and in a timely manner. We will not be responsible for faulty or inadequate repair
> work *or any additional damage caused by a failure to expedite repairs or other
> failure to protect the property from further damage*.[87]

### a. Concurrent Causes

AIIC posits that the Plaintiff set out to perform a ***complete renovation*** of the Property,

without then fulfilling its burden to segregate the repair of damage sustained by a covered cause

of loss under the Policy from the renovations or upgrades performed on the Property that are

excluded from coverage under the Policy.[88] Although an insured who performs work on covered

property beyond the scope of covered damages is not precluded from recovering under Texas law,

the doctrine of concurrent causation enforces the principle that the insured only has a right to

---

[81] *See id.* at 6, 221; *see also* ECF No. 80-1, pp. 233–37.
[82] *See* ECF No. 72-1, pp. 6, 222.
[83] *See* ECF No. 81-1, p. 312.
[84] *Id.*
[85] ECF No. 72-1, pp. 297–298.
[86] *Id.*
[87] *Id.* (emphasis added).
[88] *See* ECF No. 72, pp. 22–23, ¶¶ 3.9–3.10.

recover for that which is covered under their policy. *See Wallis v. United Services Auto Ass'n*, 2 S.W.3d 300, 303 (Tex. App.–San Antonio 1999, pet. denied).

This means that the insured must show that the damage underlying its insurance claim was caused by a covered cause of loss. *See Oyster Creek Fin. Corp. v. Richwood Investments, II, Inc.*, 957 S.W.2d 640, 649 (Tex. App.–Amarillo 1997, pet. denied) (quoting *Gulf Coast Investment Corp. v. Rothman*, 506 S.W.2d 856, 868 (Tex. 1974)).   Although a plaintiff is not required to establish the amount of its damages "with mathematical precision," there must be some reasonable basis upon which the jury's finding rests, the lack of which is "fatal" to the plaintiff's claim. *Wallis*, 2 S.W.3d at 304; *see also Tchakarov v. Allstate Indem. Co.*, No. 3:20–CV–2769–D, 2021 WL 4942193 at *6 (N.D. Tex. Oct. 22, 2021) (Fitzwater, J.) (*citing Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993)).   "It is essential that the insured produce evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971); *see also Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.–Houston [14th Dist.] 2003, pet. denied); *see also, e.g., Dallas Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 227 (Tex. App.–Dallas 2015, no pet.) (holding there was no reasonable basis for estimating amount of damage caused by risk covered by the insurance policy).

In this case, there is evidence of concurrent causes. According to AIIC, the invoices that are referred to as evidence in Plaintiff's Amended Complaint (the "**Decagon Invoices**") only refer to general line items, and do not differentiate between covered costs of repairs to the water-damaged portions of the Property, uncovered costs of repairs due to mold or another cause of loss

outside the scope of the Policy, and renovations or upgrades.[89] Further, Mr. Pate testified in deposition that he prepared an estimate for the renovations as an "umbrella estimate" and ***could not testify*** as to the scope of work performed in each room of the Property.[90] Mr. Pate also admitted that his bid was based on the scope of work that was necessary as of October 2021, but that if he had been at the Property starting work in February, there would have been less work to do, and he could have had the Property reopened within two to three months.[91] When asked for clarification of what caused the increase in work, he answered that "nothing was done" and that "[w]henever there is stagnant water sitting, it starts growing stuff."[92] The Court finds that this is sufficient evidence of concurrent causes to trigger Plaintiff's burden to provide evidence that would enable a jury to reasonably apportion the resulting harm.

### i.    The Decagon Invoices

AIIC argues that, based on the record before the Court, a factfinder would not be able to estimate the amount and cost of reasonable and necessary repairs that would be attributable to the water damage from the Freeze Claim in comparison to work attributable to renovations/upgrades or other uncovered causes of loss, such as mold.[93] The Plaintiff retorts without reference to authority that it is entitled to payment of the full amount of the Decagon contract, which Plaintiff refers to as having been "approved" by the Court.[94] The Court will note that although it approved Decagon's retention in the Bankruptcy Case, the Court also specifically conditioned that Decagon be paid solely from insurance proceeds.[95] In fact, although not critical to its ruling on Cash

---

[89] *See* ECF No. 72, pp. 22–23, ¶¶ 3.9–3.10; *see also* ECF No. 72-2, pp. 137–40.
[90] *See* ECF No. 72-2, p. 129, lines 17–25; *see also* ECF No. 72-2, p. 130, lines 1–9.
[91] *See id.* at 133.
[92] *Id.* at 135–36. The Court notes that mold coverage is specifically excluded under the Policy. *See* ECF No. 72-1, p. 152–54.
[93] ECF No. 72, pp. 22–23, ¶¶ 3.9–3.10.
[94] ECF No. 81, pp. 30–31, ¶¶ 95–96.
[95] *See* ECF No. 82, Case No. 21-30958-MVL11 (Bankr. N.D. Tex. Feb. 7, 2022).

Collateral in the Bankruptcy Case, the Court forewarned Mr. Pate that an insurance company would likely require a contractor to distinguish between repair work and renovations. The Court never stated or implied that Decagon would be entitled to payment of its entire contract without first providing proof that the work performed was necessary or covered under the Policy.

Plaintiff asserts the Decagon Invoices demonstrate that AIIC should have paid more than it currently has for Building Repair, or at the least that there is an outstanding issue of material fact for trial.[96] Plaintiff asserts that AIIC was sent the Decagon Invoices in discovery.[97] However, in an e-mail sent on June 27, 2022, in response to the production of the Decagon Invoices, AIIC's counsel made clear:

> We need more detailed information regarding the amounts charged, scope of work, etc. for Decagon. The invoices have categories of type of work ("plumbing, framework"), but do not have line items, do not indicate the rooms in which work was done, do not show the scope of work to each room, and do not show the cost of materials.[98]

Moreover, the Court notes that AIIC's immediate response to this production with a request for further information is required by the Policy. Section G(3)(e) of the Policy provides:

> **e.** We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2), or (3), subject to **f.** below:
>   **(1)** The Limit of Insurance applicable to the lost or damaged property;
>   **(2)** The cost to replace the lost or damaged property with other property:
>       **(a)** Of comparable material and quality; and
>       **(b)** Used for the same purpose; or
>   **(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.[99]

This provision is unambiguous.[100] In light of the language in the Replacement Cost Provision allowing payment on the basis of "comparable material and quality" and specifying payment could

---

[96] ECF No. 81, p. 31, ¶ 84–85.
[97] *Id.* at ¶ 83.
[98] ECF No. 81-3, p. 192.
[99] *Id.* at 192; *see also* ECF No. 72-1, p. 129.
[100] *See Central Mut. Ins. Co.*, 2014 WL 1092121 at *7 (gathering cases); *see also Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 425–26 (Tex. 2004).

only be provided for what was "necessary to repair or replace the lost or damaged property," the Court agrees with AIIC that the Decagon Invoices do not provide the degree of specificity necessary to distinguish between covered work and uncovered work.

ii.    The Subcontractor Invoices

In its June 27, 2022 email,  AIIC's counsel notes that she has subpoenaed Decagon to get more information … so that the claim for replacement cost can be evaluated."[101] The Court will note that the record in this case reflects that Mr. Pate was served a subpoena requiring him to appear at a deposition on August 11, 2022, and a  contemporaneous subpoena duces tecum required him to produce "documents relevant to the work on the [Property]."[102] On the ***day*** of the deposition, Plaintiff's counsel advised counsel for the Defendant that Mr. Pate had not had time to gather the documents that had been requested.[103] Counsel for the Defendant decided to proceed with the deposition to avoid delay, with the understanding and agreement from Mr. Pate that he would produce the documents later.[104] At the deposition, Mr. Pate testified under oath that he had received the subpoena, that he was in possession of the responsive documents, and would produce the documents.[105] Nearly a month later, the Defendant had not received the documents from Mr. Pate. When counsel reached out to him, he advised that he was ill with COVID-19 and would provide the documents after he recovered.[106]

Three weeks later, Mr. Pate apprised the Defendant's counsel via e-mail that he had unilaterally provided the subpoenaed documents to Viva Inn's principal, Mr. Patel, who would in turn produce them for the Defendant at his own deposition.[107] When Mr. Patel failed to produce

---

[101] *See* ECF No. 81-3, p. 193.
[102] *See* ECF No. 45-1, p. 2.
[103] *See id.* at 15.
[104] *See* ECF No. 45, p. 4.
[105] *See* ECF No. 45-1, p. 23.
[106] *See id.* at 11.
[107] *See id.* at 8.

any documents at his deposition, the Defendant filed its Motion to Compel.[108] The Court held a

hearing on the Motion to Compel on November 22, 2022.[109] At the hearing, Mr. Pate testified that

he maintained **no** electronic files with regard to invoicing. Mr. Pate and Mr. Patel each testified

that the documents had been turned over to Mr. Patel prior to his deposition, but that Mr. Patel had

left them in his car and that those documents had subsequently been stolen.[110] Likewise, Mr. Pate

struggled to even recount any of the names of the subcontractors who performed work on the

project, despite the fact that this was the only project he was working on and the project was wholly

subcontracted out. The Court found Mr. Pate and Mr. Patel's testimony to be seriously lacking in

credibility. The Court ordered Decagon, Mr. Pate, and the Plaintiffs to produce any and all

documents each had in their possession, and to contact all financial institutions, vendors, and

subcontractors to reproduce any and all receipts, invoices, and other documents relevant to the

repairs and renovations of the Property.[111]

In its Response to the MSJ, the Plaintiff relies on the documents that were produced as a

result of the Court's Order on the Motion to Compel (the "**Subcontractor Invoices**") for evidence

of an issue of material fact for trial.[112] In its Reply, AIIC points out that the Subcontractor Invoices

are not included in either party's summary judgment appendix, as required by this Court's local

rules in order to be considered part of the summary judgment record.[113] In an apparent attempt to

---

[108] ECF No. 45.

[109] ECF No. 53; *see also* ECF No. 73.

[110] ECF No. 53; *see also* ECF No. 73.

[111] *See* ECF No. 58.

[112] *See* ECF No. 81, p. 35, ¶ 96.

[113] *See* ECF No. 90, p. 16, n. 20; *see also* L.B.R. 7056(f)(1) stating that "[a] party who relies on affidavits, depositions, answers to interrogatories, or admissions on file to support or oppose a motion for summary judgment shall include such evidence in an appendix." L.B.R. 7056(e)(3) states that "[a] party whose motion or response is accompanied by an appendix shall include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence." As noted prior, L.B.R. 7056(g) states that "[e]xcept for the motions, responses, replies, briefs, and appendixes required by these rules, a party may not, without the permission of the Presiding Judge, file supplemental pleadings, briefs, authorities, or evidence."

correct this omission, the Plaintiff states the following in its Response to Motion to Strike Declarations: "[t]he out-of-pocket figure of $360,038.77 is nothing more than the sum of invoices produced to AIIC's attorneys in December 2022, per this Court's order compelling discovery," attaching the Subcontractor Invoices as Exhibit 14 to that pleading.[114] The Court will note that L.B.R. 7056(g) precludes the filing of supplemental evidence outside of the motions, responses, replies, briefs and appendixes required by the local rules.[115] However, even if the Court were to consider the Subcontractor Invoices as evidence properly within the summary judgment record, the Plaintiff would still fail to overcome its burden to provide a reasonable basis by which a factfinder could establish the amount or proportion of work that was performed because of a covered loss.

For instance, in *Tchakarov v. Allstate Indem. Co.*, in response to a motion for summary judgment, the plaintiffs made the *ipse dixit* assertion that they had provided a basis by which the jury could calculate covered damages, but failed to explain what that method was. 2021 WL 4942193 at *6. The district court in that case could not itself identify a method from the summary judgment record, and the plaintiffs' own expert witness similarly had not attempted to distinguish between damage caused by covered and uncovered causes. *Id.* In consideration of the foregoing, Judge Fitzwater held that plaintiffs had failed to meet their burden and granted summary judgment in favor of the defendant. *Id.*

In *Dallas Nat'l Ins. Co. v. Calitex Corp.*, the Texas state court of appeals found that plaintiffs failed to establish a genuine issue of fact for trial in response to a motion for summary judgment on a claim for breach of contract where plaintiffs' expert testimony established the amount spent on repairs and the work that had been completed without apportioning in any way

---

[114] *See* ECF No. 98, p. 15, ¶ 28; *see also* ECF No. 98-14.
[115] *See* L.B.R. 7056(g).

among covered and uncovered damages. 458 S.W.3d 210, 227 (Tex. App.–Dallas 2015, no pet.).

Notably, the court of appeals considered portions of testimony that were not properly admitted into

evidence, as they had been attached to a supplemental response that was filed late and without

leave of the court. *Id*. at 228. The *Dallas Nat'l* court of appeals held that even if those portions of

testimony had been properly admitted, the plaintiffs still could not establish that they had fulfilled

their burden. *Id.* ("Even assuming without deciding that the portions of testimony in question were

properly admitted into evidence … we conclude there is no "reasonable basis" in the record "for

estimating the amount of damage or the proportionate part of damage cause by a risk covered by

the insurance policy.") (citing *Travelers Indem. Co.*, 469 S.W.2d at 163).

The Subcontractor Invoices suffer from the same failings as the Decagon Invoices. Several

of the invoices contain general descriptions of types of work completed without detailing the scope

of work, materials used, or where the work was completed on the Property.[116] For instance, the

Court notes that $303,234.57 of the Subcontractor Invoices were allegedly paid to ***one***

subcontractor, Imer Salgado, who is purportedly the sole proprietor of a company called Executive

LLC.[117] The largest invoice contains the following entries: "8. Drywall Removal and Replace -

$15,375.00, 9. Drywall Tape and Bed [Texture] – $23,037.50, 10. Painting - $27,900.00, 11.

Roofing Metal Flushing, Gutters - $14,000.00."[118] The Subcontractor Invoices also refer to items

that obviously do not constitute Building Repair from water damage resulting from the Freeze

Claim, such as the striping of the parking lot.[119] In consideration of the foregoing, the Court finds

that the Subcontractor Invoices, even were they to be considered properly part of the summary

---

[116] *See, e.g.,* ECF No. 98-14.
[117] *Id.* at 49–54.
[118] *Id.* at 53.
[119] *Id*. at 75.

judgment record, do not establish that Plaintiff has overcome its burden of proof on the doctrine of concurrent causes.

iii.    The Expert Testimony

The Fifth Circuit has held that expert testimony is "essential" for proving the costs of reconstruction. *See Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007). Plaintiff's expert witness in the instant case is Mr. Pate, the contractor who performed the repair work on the Property and the individual who, the Court will take judicial notice of, also managed the Property after the renovations were complete.[120] Despite singularly supervising the renovation and reconstruction, Mr. Pate testified at his deposition that he could not determine the exact scope of the work performed in each room or apportion between covered and uncovered causes of damage.[121] Nevertheless, Mr. Pate subsequently signed a declaration which was filed in conjunction with Plaintiff's Response stating that "my invoice[s] and billing only includes work done to remediate the flood damage. Other work, such as for the roof, does not appear in Decagon's charges."[122]

This declaration is obviously inconsistent with Mr. Pate's prior sworn deposition testimony. The Supreme Court, in *Cleveland v. Policy Mgmt. Sys. Corp.*, held that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to later resolve the disparity." 526 U.S. at 806. The Fifth Circuit has held that when a party changes its testimony, it must provide some explanation for the discrepancy, or the affidavit may be stricken from the

---

[120] *See* ECF No. 85.
[121] *See* ECF No. 72-2, pp. 129–130.
[122] ECF No. 81-3, p. 213.

summary judgment record. *See Free v. Wal-Mart La., L.L.C.*, 815 Fed. App'x 756, 766 (5th Cir. 2020); *but see S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996) (holding that an affidavit that merely supplements the deposition testimony by clarifying facts or giving greater detail not provided in the deposition, may be considered when evaluating genuine issues on a motion for summary judgment).

Mr. Pate's tardy declaration does not contain any statement attempting to explain or reconcile the contradiction inherent in his testimony.[123] As such, the Court will disregard the inconsistent statements contained in Mr. Pate's declaration as improper summary judgment evidence. The Court will note that even if the statements in the declaration were considered valid summary judgment evidence, none of the statements provide any further clarity on how the work described in the Decagon Invoices or the Subcontractor Invoices could be apportioned between covered and uncovered causes of loss as required by section G(3)(E) of the Policy and applicable Texas law.[124] As such, the Court finds that the Plaintiff has failed to fulfill its burden to provide a reasonable basis by which the fact finder could calculate the covered damages on its claim for Building Repair.

### b.  The Fire Suppression System

In the Amended Complaint, the Plaintiff separately argues that the Defendant breached its contract for Building Repair by unreasonably failing to pay for the cost to replace the sprinkler system and fire alarm system (together, the "**Fire Suppression System**").[125] Defendant's MSJ notes that when AIIC issued payment of the ACV amount to Viva Inn, the amount paid included a partial payment of the Plaintiff's estimate for the Fire Suppression System, specifically

---

[123] *See* ECF No. 81-3, pp. 213–214.
[124] *See id.*
[125] *See* ECF No. 49, pp. 4–5.

$66,915.65.[126] This amount was based on Sedgwick's report that recommended payment of $45,056.18 for the sprinkler system, because the estimate provided by Plaintiff included metal pipe, which was more expensive than the original system that was being replaced.[127]  The Court notes that Defendant paid the remaining undisputed RCV on the fire alarm of $5,464.80 when AIIC issued payment of $81,227.27 based on Cavalry's estimate and report that showed that repairs to the Property had been substantially completed in July of 2022.[128] Defendant argues that in light of its RCV payment, Plaintiff has failed to supply evidence that shows that AIIC owes anything further than what it has already paid on the claim for the Fire Suppression System.[129]

The Plaintiff argues that it provided evidence that Plaintiff had paid Diversified Fire ("**Diversified Fire**"), the company which performed the repairs on the Fire Suppression System, $70,000.00, and that it had provided the a copy of the check to AIIC as proof that it was owed at least that amount.[130] However, Plaintiff does not argue that it only replaced the sprinkler system with a system of "comparable material and quality" as required by the Policy, nor does Plaintiff direct the Court's attention to any evidence showing that the payment made to Diversified Fire was for work that was performed in conformity with the terms of the Replacement Cost Provision. Furthermore, the Court notes that on its own review of the summary judgment record, even the Plaintiff's own public adjuster estimated the cost for the sprinkler system as $45,056.18, which is the exact amount that AIIC initially paid to Viva Inn for ACV on the sprinkler system.[131] Based on this record, it is this Court's opinion that no reasonable juror could come to the conclusion that

---

[126] *See* ECF No. 72, p. 22, ¶ 3.8.
[127] *See* ECF No. 81-1, p. 330.
[128] *See* ECF No. 72-1, pp. 321, 365.
[129] *See* ECF No. 90, p. 13, ¶ 2.8.
[130] *See* ECF No. 81, p. 21, ¶ 48; *see also* ECF No. 81-3, pp. 216–217. The Court also notes that at the time that Plaintiff made this payment, May 10, 2021, the repairs had not yet been performed on the Fire Suppression System, so this check could not conceivably be evidence of RCV.
[131] *See* ECF No. 81-3, p. 64.

Plaintiff would be entitled to further benefits under the Policy for replacement of the Fire Suppression System, and that as such, there is no issue of material fact for trial. It is therefore this Court's recommendation that the District Court grant summary judgment with respect to the Plaintiff's claim for breach of contract on Building Repair.

 2. <u>Contents Loss</u>

Next, AIIC argues that it is entitled to summary judgment on Plaintiff's breach of contract claim for replacement of the Contents of the Property because the Plaintiff never performed the duties required of it in order to receive further payment under the Policy, and as such, Plaintiff has wholly failed to provide any evidence that it is entitled to further payment for damage from a covered loss. Plaintiff does not dispute the allegation that it failed to comply with the Policy's requirement to provide documentation of damaged and undamaged business personal property.[132] Instead, Viva Inn argues that AIIC already had an inventory of the Contents of the Property from an internal report generated prior to issuing coverage on the Policy, and further argues that developing the required inventory itself would have been futile because the Contents loss was a "total loss" due to water damage.[133]

The Contents loss is governed by the "Building and Personal Property Coverage Form," which provides that the insurer will pay for direct physical loss of or damage to "Your Business Personal Property" under Section A(1)(b).[134] Notably, the Policy states that claims for Contents are valued on an ACV basis, which means that the Replacement Cost Provision does not apply.[135] Under Section E, "Loss Conditions," an insured is required to perform certain duties in the event

---

[132] *See* ECF No. 81, pp. 33–34, ¶¶ 89–92.
[133] *Id.* at ¶¶ 89–90.
[134] Section A(1)(b) covers property such as furniture, fixtures, machinery and equipment, stock, and all other personal property owned by the insured and used in its business. *See* ECF No. 72-1, p. 115.
[135] *See* ECF No. 72-1, p. 29. Plaintiff mistakenly refers to a section of the Replacement Cost Provision when discussing the Contents loss in its Response brief. *See* ECF No. 81, pp. 32–33, ¶¶ 88–89.

of loss or damage to Contents.[136] The Policy requires an insured to provide "complete inventories

of the damaged and undamaged property," including quantities, costs, values and amounts of loss

claimed.[137] Section E(4), entitled "Loss Payment," conditions payment on the following: "if you

have complied with all of the terms of this Coverage Part, and: (1) We have reached agreement

with you on the amount of loss; or (2) An appraisal award has been made."[138] The Court finds that

these terms are unambiguous. Courts in Texas have long held that prior to recovering benefits

under an insurance policy, the insured has the burden to prove its claimed damages fall under the

coverage provided by its Policy. *See United Neurology*, 101 F.Supp.3d at 593 (citing to *Data

Specialties, Inc.*, 125 F.3d at 911); *see also Employers Cas. Co. v. Block*, 744 S.W.2d at 944 (to

recover under an insurance policy, a plaintiff must prove that its claim falls within the insuring

agreement of the policy).

Based on these principles, AIIC requested information from Viva Inn regarding the damage

to the Contents on several occasions, but the insured did not comply with those requests.[139] AIIC

advanced $10,000.00 to Viva Inn for damaged Contents based solely on its own inspection of the

Property after the loss, informing Viva Inn that "no further payments will be issued unless and

until a full inventory of all damaged contents is submitted."[140]  Plaintiff never provided the

requested inventory, arguing that Viva Inn should not have to produce such records because the

Freeze Claim arose just one year after AIIC commissioned an IQS Analytics report on the Property,

which notes that "the building had been fully gutted, and all components replaced new," further

stating the estimated value provided for "furniture/fixtures/basic equipment" was $175,000.00.[141]

---

[136] Section E(3) provides 8 duties that an insured must perform in the event of loss or damage to covered property.
*See* ECF No. 72-1, pp. 124–25.
[137] *Id.* at 125, section E(3)(a)(5).
[138] *Id.* at section E(4)(g).
[139] *See* ECF No. 72, p. 20, ¶ 3.5.
[140] *See* ECF No. 72-1, pp. 310–311.
[141] *See* ECF No. 81-1, p. 248.

In its Reply, AIIC points out that the information relayed about Contents in the IQS Analytics report was based on an interview with Mr. Patel, and not based on a factual investigation of the Contents of the hotel or separate business records.[142] Even setting that aside, AIIC argues that over a year's worth of time passed between the generation of the IQS Report and the Freeze Claim, which would necessitate a new accounting of the Contents to account for any loss or depreciation that had taken place in the intervening time period, as the Policy states that ACV of damaged items is determined "as of the time of loss or damage."[143] The Court agrees.

Importantly, AIIC does not allege that Viva Inn is not entitled to ***any*** coverage for Contents under the Policy. Indeed, AIIC has already paid Viva Inn $10,000.00 for the Contents loss. Instead, AIIC simply argues Viva Inn has failed to provide any other form of documentation or proof that it was entitled to ***additional*** damages for a ***covered*** cause of loss.[144] The Court will note that it conducted its own review of the summary judgment record, including the Subcontractor Invoices, which were produced as a result of this Court's order on the Motion to Compel, and was not able to find any credible evidence that Viva Inn is owed more than $10,000.00 for Contents.[145] In fact, even though the Property was already re-opened for business at the time the tardy Subcontractor Invoices were produced, there is no credible evidence in those invoices – or elsewhere in the summary judgment record – that Plaintiff purchased more than $9,600 of furniture, fixtures, and equipment that would be covered as Contents in the Policy.[146] This is despite the fact that the Plaintiffs, Decagon, and Mr. Pate were each ordered to produce all non-privileged documents in their possession relative to the repairs of the Property, and to immediately contact all financial

---

[142] *Id.* ("Contents Values Verification Requested? Yes, Verified Via Interview").
[143] ECF No. 90, p. 8, n. 7.
[144] *Id.* at 8–9, ¶ 2.3.
[145] *See, e.g.*, ECF No. 98-14.
[146] *Id.*

institutions, subcontractors, sub-subcontractors, and any other vendors used to recreate any missing records that were relevant to the subpoena.[147] As such, it is the Court's view that the plain language of the Policy and relevant Texas authority proscribes Viva Inn from further recovery for Contents under the Policy, and that no reasonable juror could conceivably find for the Plaintiff on this issue. In consideration of the foregoing, the Court recommends that the District Court grant summary judgment to the Defendants on Plaintiff's claim for breach of contract for the Contents loss.

### 3. Business Interruption

The Defendant argues that it is entitled to summary judgment on the Plaintiff's breach of contract claim for Business Interruption ("**BI**" or, the "**BI Claim**") totaling $400,000.00 because Viva Inn has failed to provide any evidence that it is entitled to further benefits than the amount already paid under the Policy.[148] Although the Response to the MSJ never references the terms of the Policy dealing with BI, let alone any legal authority, the Court has discerned from Plaintiff's pleadings what it believes are two separate arguments in support of the Plaintiff's BI Claim. First, the Plaintiff argues that because the hotel was shuttered from February of 2021 until December of 2022, Plaintiff should be entitled to BI benefits for the entirety of that period.[149] Second, although Plaintiff admits that it is unclear on the exact calculation of the BI Claim,[150] Plaintiff argues that the evidence shows that AIIC owes at least more than the applicable limit of insurance, which is $100,000.00.[151]

---

[147] *See* ECF No. 58.
[148] *See* ECF No. 72, pp. 21–22, ¶ 3.7; *see also* ECF No. 90, pp. 9–13.
[149] *See* ECF No. 81, pp. 26–27, ¶ 67.
[150] Plaintiff argues, based on the fact that 2020 was a year of historically low hotel occupancy due to COVID-19 and its allegation that the Property was "closed for most of 2019 due to a complete renovation," that the BI Claim should be calculated based on its tax records for 2018. *See* ECF No. 81, p. 11, ¶ 14.
[151] *Id.* at ¶¶ 68–72.

In its Reply, AIIC points out that it requested a calculation of the BI Claim in its discovery requests, but that Plaintiff's Rule 26 Disclosures failed to disclose how that figure was calculated or identify documents that support such a figure under the terms of the Policy.[152] After the MSJ was filed, in a Declaration dated January 20, 2023, Plaintiff attempted to provide an explanation of the BI Claim calculation for the first time.[153] AIIC argues that even setting aside the procedural failures inherent in the late-filed declaration, the Plaintiff has failed to provide any evidence showing that it is entitled to BI coverage under the Policy's terms for a period of nearly **two years** while the Property was undergoing what Defendant believes to be a "complete renovation."[154] Defendant also avers that the Plaintiff did not begin work as soon as possible to mitigate the damage from water intrusion on the Property as required by the Policy.[155] Based on those arguments, AIIC believes that Plaintiff's breach of contract claim for BI fails, and that Defendant should be entitled to summary judgment. The Court agrees with the Defendant for the reasons espoused below.

Before turning to the discussion of the BI Policy terms and applicable law, the Court will briefly touch on the potential discovery abuse alleged by the Defendant. The Court will note that Plaintiffs' Rule 26 Disclosures did not disclose how exactly the BI Claim was calculated, instead referring generally to the Statement of Financial Affairs ("**SOFA**") filed by New York Inn in the Bankruptcy Case and Viva Inn's tax returns.[156] Plaintiff seems to have attempted to supplement its disclosure with the Declaration of Mr. Patel, included as an exhibit to its Response to the MSJ.[157] As discussed above, the Defendant filed a Motion to Strike Declarations in conjunction

---

[152] *See* ECF No. 90, p. 9, ¶ 2.4.
[153] *See* ECF No. 81-3, pp. 210–12.
[154] *See* ECF No. 90, p. 13, note 13.
[155] *Id.* at 8, n. 5; *see also* ECF No. 72-1, pp. 302, 309.
[156] *See* ECF No. 72-1, p. 381 ("Interrogatory No. 3 and Answer").
[157] *See* ECF No. 81-3, p. 210–12.

32

with its Reply brief, asking the Court to strike Mr. Patel's declaration from the summary judgment record.[158] The Court declined to strike the declarations. The Court ruled that, in light of the overall record, even if the late-filed declaration were to constitute a failure to provide information required by Rule 26(a), that failure to disclose was ultimately harmless to Defendant and therefore permissible under Rule 37(c)(1). *See* FED. R. CIV. P. 37(c)(1); *see also Tex. A&M Research Found.*, 338 F.3d at 402. The reason that the Court feels its consideration of the declaration was "harmless" is because Plaintiff's BI Claim, and the calculation thereof, as referenced in Mr. Patel's late-filed declaration, is not based on the terms of the Policy or any other authority.

### a. Period of Restoration

The BI Claim is governed by the Policy's "Business Income (and Extra Expense) Coverage Form," which provides: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'"[159] The "suspension" must be caused by "direct physical loss of or damage to property" as a result of a covered loss.[160] The "period of restoration" is defined as the period of time that begins 72 hours after the time of direct physical loss or damage, and ends on the earlier of: "(1) the date when the property at the described premises ***should be repaired, rebuilt or replaced with reasonable speed and similar quality***; or (2) The date when business is resumed at a new permanent location."[161]

The language of the Policy is unambiguous and does not support the Plaintiff's interpretation that it should be entitled to BI benefits from February 2021 until December 2022. *See, e.g., Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F.Supp.2d 235, 239 (S.D.N.Y. 2003) ("On ***their face***, the Restoration Period clauses envision a hypothetical or constructive (as

---

[158] *See* ECF No. 91.
[159] ECF No. 72-1, p. 131.
[160] *Id.*
[161] *Id.* at 139 (emphasis added).

opposed to actual) time frame for rebuilding…") (emphasis added); *see also Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1077 (3d Cir. 1980); *Steel Products Co. v. Millers Nat'l Ins. Co.*, 209 N.W.2d 32, 38 (Iowa 1973); *Rogers v. Am. Ins. Co.*, 338 F.2d 240, 242 (8th Cir. 1964). Again, the definition of "Period of Restoration" limits the BI benefits that Plaintiff can recover to "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality."[162] This definition does not support a plaintiff's recovery for an indefinite period of time until repairs are ***actually*** completed. Instead, the Policy limits coverage to the date when the property ***should have been*** repaired, rebuilt or replaced with reasonable speed and similar quality. *See Lava Trading Inc. v. Hartford Fire Ins. Co.*, 365 F.Supp.2d 434, 442 (S.D.N.Y. 2005) ("'period of restoration' does not look to the resumption of a policyholder's 'operations' as a measuring stick. It looks to 'when the property at the described premises should be repaired, rebuilt or replaced.'"). Courts across the country have addressed this distinction, holding that the period of restoration is defined in theoretical terms in order to protect insurers against the risk of open-ended liability by preventing a potentially "unlimited 'actual' rebuilding period."[163]

The Supreme Court of Iowa, in *Steel Products Co. v. Millers Nat'l Ins. Co.* stated that where there is a difference between the actual and theoretical periods of restoration, the theoretical date "by which the damaged premises ***could have been*** restored with due diligence" functions as

---

[162] *Id.* at 131 (emphasis added).

[163] *S.R. Intern. Business Ins. Co., Ltd. v. World Trade Center Properties, LLC*, No. 01 Civ.9291(MBM), 2005 WL 827074 *6 (S.D.N.Y. Feb. 15, 2005); *see also Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 843 F.2d 1140, 1143 (8th Cir. 1988) ("It is clear that this language contemplates the '*theoretical* time period it would have taken to' reenter business."); *Beautytuft, Inc. v. Factory Ins. Ass'n*, 431 F.2d 1122, 1124 (6th Cir. 1970) ("[T]his contract provides a theoretical as opposed to an actual replacement time as the basic time standard for computation of business interruption loss."); *Steel Products Co.*, 209 N.W.2d at 38. ("The theoretical period defined in the policy is the length of time required with the exercise of due diligence and dispatch to rebuild, repair or replace the damaged premises. Where the actual restoration period exceeds the theoretical period or where the premises are not restored, the theoretical period becomes the computation period.").

a cut-off date for computation of reduced gross earnings.[164] The Third Circuit, in *Pennbarr Corp. v. Ins. Co. of N. Am.*, reiterated this principle, holding that "[t]his type of policy is not designed to compensate for losses sustained beyond the 'period of restoration.'"[165] Notably, in *Congress Bar & Restaurant, Inc. v. Transamerica Ins. Co.*, the Supreme Court of Wisconsin held that although an insured may "utilize a business interruption … to upgrade his business property … that decision should not increase the amount of recovery to which he is entitled – he would still be limited to compensation for the shorter period of time in which the structure could be repaired."[166]

In some situations, courts have authorized extensions of the hypothetical restoration period for reasonable and necessary delays attributable to actions taken by the insurers, but not because of an insured's lack of due diligence or poor financial condition. *See Hampton Foods*, 843 F.2d at 1143 (providing coverage for "delay attributable to [the insurer's] failure to perform its duties" but not for "delay caused by other obstacles such as [the insured's] alleged lack of due diligence or poor financial condition."). Such situations might include where an insurer denies coverage or delays payment of necessary benefits the insured needs in order to begin repairs "as quickly as possible."[167] For instance, in *G&S Metal Consultants, Inc. v. Contintental Cas. Co.*, the court held that an issue of fact existed for trial where plaintiff pointed to evidence showing that even though it acted "as quickly as possible," it was not able to repair its property within the hypothetical period of restoration due in part to the fact that the insurer delayed in making payment.[168]

---

[164] 209 N.W.2d at 37–38.

[165] 976 F.2d 145, 155 (3d Cir. 1992).

[166] 165 N.W.2d 409 (Wis. 1969).

[167] *See Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 355 (8th Cir. 1986) (holding that the key inquiry is not whether the insurer technically complied with the policy's provisions, but whether they took some action or failed to act in a way that caused a delay in the insured's repairs). *See also, e.g., Meadowcrest Living Center L.L.C. v. Hanover Ins. Co.*, No. 06–3210, 2008 WL 2959707 at *2–3 (E.D. La. Jul. 30, 2008) (noting that the delay of an insurer's adjuster in approving repairs could support a longer period of restoration).

[168] 200 F.Supp.3d 760, 772–773 (N.D. Ind. Aug. 2, 2016).

That is not the situation that is presented to the Court in the instant case. Notably, the Plaintiff generally alleges that AIIC delayed in making its payment to Plaintiff, but nowhere in its Response does Plaintiff argue, nor does it direct the Court's attention to any evidence that shows that Plaintiff was unable to begin repairs "as quickly as possible" because AIIC denied coverage or unreasonably delayed in sending an initial payment.[169] While Plaintiff argues that AIIC "had its own interests in mind" when it denied Plaintiff's request for moisture mapping, the Court finds it instructive that Plaintiff does not argue that the denial of this request was evidence that AIIC imposed a delay on the process of rebuilding.[170] For good reason, because the very e-mail which denies Plaintiff's request for moisture mapping also states that moisture mapping would "unnecessarily delay the *mitigation* process."[171] Further, AIIC strongly suggested that Plaintiff "have a qualified mitigation contractor come out to begin the drying process immediately … as your policy requires you to take all reasonable steps to protect the property from further damage."[172]

Plaintiff likewise argues that AIIC unreasonably delayed payment for the BI Claim after receiving (at least some) documentation of Plaintiff's historical business income.[173] Specifically, Plaintiff argues that despite its own *three-month* delay in sending any documentation of the Plaintiff's past business income to AIIC to allow it to calculate the BI Loss, that AIIC should have responded sooner to a payment request purportedly forwarded by Sedgwick's agent, Mr. Keefer.[174] The evidence that Plaintiff cites to for this proposition is (1) an e-mail exchange between Mr.

---

[169] *See* ECF No. 81, pp. 17–19, 26–28, 34.
[170] *See id.* at 18, ¶ 41.
[171] ECF No. 72-1, p. 301 (emphasis added).
[172] *Id.* at 302.
[173] *See* ECF No. 49, pp. 5–8; *see also* ECF No. 81, pp. 26–28.
[174] *See* ECF No. 81, pp. 27–28; *see also* ECF No. 81-2, p. 31.

Keefer and Mr. Small that took place on August 12–13, 2021,[175] and (2) deposition testimony of Ms. Rozzelle of AIIC.[176]

The Court will note that although the e-mail exchange from August 12–13, 2021, shows that Mr. Keefer stated he sent a payment request to AIIC for BI and Contents, the e-mail does not state exactly when the request was sent. Similarly, nothing in the deposition testimony of Ms. Rozzelle reflects when AIIC received the P&L Statement or payment request, as Ms. Rozzelle testifies that she does not recall when she received the same. The Court finds Ms. Rozzelle's testimony significant, however, because she states that the claim, as calculated by the Accountant did not take into account either the waiting period prior to coverage beginning or the coinsurance on the claim, and that it needed to be recalculated by her in order to comply with the Policy provisions.[177] The Court also notes that as soon as Ms. Rozzelle was contacted directly by Mr. Small, she responded that she would take a look at the file immediately, and the very next day issued payment on both the BI and Contents claims.[178]

Again, the Plaintiff *does not* argue that Ms. Rozzelle's delay in payment of the BI Claim prevented Viva Inn from finding a contractor or from beginning repairs "as quickly as possible." Instead, Plaintiff simply states that AIIC delayed in making payment on Viva Inn's BI Claim, despite having submitted some, but not all, of the documentation requested, months after it was initially requested by AIIC. However, even looking independently at the timeline of events surrounding the date of loss, the Court cannot find any evidence in the summary judgment record that would warrant an expansion of the period of restoration. The Court will take judicial notice of the fact that the Bankruptcy Case began as an *involuntary* case on May 21, 2021, *over three*

---

[175] *See* ECF No. 81-2, p. 31.
[176] *See id.* ECF No. 81-3, pp. 58–59.
[177] *See id.* at 58.
[178] *See* ECF No. 81-2, pp. 45–52; *see also* ECF No. 72-1, pp. 308–312.

*months* after the date of loss.[179] Further, New York Inn did not consent to entry of the order for relief until a status conference on July 20, 2021.[180] Still, neither New York Inn, nor Viva Inn sought to hire a contractor to begin work on the Property until October 25, 2021, seeking approval of Decagon's contract on or about November 17, 2021, nearly a month later.[181] Notably, in the same motion, New York Inn notes that insurance proceeds which ***were already paid*** were in the possession of New York Inn's secured lender, Spectra Bank, having been applied to mortgage payments that were due.[182] The Court recalls that ***months*** of time were spent in a dispute between Spectra Bank and New York Inn as to its intended utilization of the insurance proceeds.

Sedgwick inspected the Property for AIIC as soon as it was able to coordinate a date with Mr. Small and AIIC approved payment of an undisputed ACV amount within two weeks of receiving Sedgwick's report.[183] The record reflects that despite having received this payment, apart from the Fire Suppression System, the Plaintiff did not begin repairs on the Property until October of 2021.[184] In its initial inspection, Sedgwick estimated that the period of restoration should last approximately 2 months from when repairs began.[185] Sedgwick's estimate is backed up by Plaintiff's own expert witness' testimony at deposition. Mr. Pate testified that if he had been contracted to start repairs on the hotel in February 2021, shortly after the date of loss, the hotel would have been opened by April or May 2021.[186] In the end, the amount that Defendant actually paid was based on an estimated period of restoration of three and a half months, which is greater than Sedgwick's initial estimate.[187]

---

[179] ECF No. 1 in Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021).
[180] *See* ECF Nos. 17, 18 in Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021).
[181] *See* ECF Nos. 60, 61 in Case No. 21-30958-MVL11 (Bankr. N.D. Tex. 2021).
[182] *Id.* at pp. 2–3, ¶¶ 6–7.
[183] *See* ECF No. 72-1, pp. 297–98, 301–305.
[184] *See* ECF No. 72-2, p. 133.
[185] *See* ECF No. 81-1, p. 371.
[186] *See* ECF No. 72-2, p. 133, lines 16–24.
[187] ECF No. 72-1, p. 308.

As such, it is this Court's finding that on the arguments advanced and the evidence referenced, a reasonable juror could not possibly find in favor of Plaintiff that the period of restoration should be expanded from that which AIIC used to base its payment for the BI Claim.

### b. Loss Determination

In Plaintiff's Amended Complaint, Plaintiff contends that AIIC is liable for breach of contract on the BI Claim because it failed to adequately calculate the lost income ("**BI Loss**") based on Plaintiff's 2018 tax records.[188] Specifically, Plaintiff contends that as of late 2021, its BI Loss was approximately $400,000.00, and that AIIC's payment of $26,349.81 was deficient at least in the amount still available under the Policy's limits.[189] AIIC argues that Plaintiff did not provide AIIC with its 2018 tax return information until after commencing the instant Adversary Proceeding, and even if it had, that information would be irrelevant, as that is not the way that BI Loss is calculated under the Policy's "Loss Determination" provision or Texas law.[190]

In its Response to the MSJ, Plaintiff simply reiterates that New York Inn's SOFA and Viva Inn's tax returns could be used to calculate Viva Inn's "continuing exposure" and should "justify AIIC's release of further payments" without reference to the terms of the Policy or any stated legal authority for that proposition.[191] In its Reply, the Defendant points out that prior to discovery in the instant Adversary Proceeding, the only document ever provided to AIIC to support Plaintiff's BI Claim was the P&L Statement for the three-month period between October and December of 2020.[192] Further, AIIC contends that Plaintiff's breach of contract claim fails because it was not

---

[188] *See* ECF No. 49, pp. 6–8.
[189] *Id.* at 7, ¶ 21.
[190] *See* ECF No. 72, pp. 20–22.
[191] *See* ECF No. 81, pp. 26–28.
[192] *See* ECF No. 90, p. 12, ¶ 2.6.

calculated under the Policy's terms or any relevant legal authority, and Plaintiff has failed to produce any evidence that AIIC's calculation of BI Loss was deficient in any way.[193]

The Policy provides the following explanation of how a BI Loss should be calculated:

**3. Loss Determination**
**a.** The amount of Business Income loss will be determined based on:
  (1) The Net Income of the business before the direct physical loss or damage occurred;
  (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of Covered Cause of Loss on customers or on other businesses;
  (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
  (4) Other relevant sources of information, including:
      (a) Your financial records and accounting procedures;
      (b) Bills, invoices and other vouchers; and
      (c) Deeds, liens or contracts.[194]

This provision is unambiguous and has been widely interpreted by courts in Texas and the Fifth Circuit. *See Finger Furniture Co. Inc. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005); *see also Metro Hospitality Partners, Ltd. v. Lexington Ins. Co.*, 84 F.Supp.3d 553, 561 (S.D. Tex. 2015). The Fifth Circuit held, in *Finger Furniture*, that "[t]he strongest and most reliable evidence of what a business would have done had the catastrophe not occurred is what it had been doing in the period ***just before*** the interruption."[195] Therefore, the Court finds as a matter of law that AIIC did not err when it based its calculation of the BI Loss on the P&L Statement initially provided by Plaintiff, as that document provided evidence of what Plaintiff "had been doing in the period just before the interruption."

---

[193] *Id.* at 12–13, ¶ 2.7.
[194] *See* ECF No. 72-1, p. 136.
[195] 404 F.3d at 314 (emphasis added).

Separately, the Court finds that the Plaintiff has failed to direct the Court's attention to any evidence in the summary judgment record to support its contention that it is owed more under the Policy than what AIIC has already paid on the BI Claim. Plaintiff argues that New York Inn's SOFA[196] and Viva Inn's tax returns provide evidence of Viva Inn's "continuing exposure," but never references any provision of the Policy which challenges the sufficiency of AIIC's initial payment on the BI Claim. Further, Plaintiff cites no legal authority for its proposition that it is owed more for BI coverage under the Policy. On the record before the Court, no reasonable juror could possibly find for the Plaintiff on its breach of contract claim for Business Interruption. As such, and in light of the Court's foregoing conclusions, it is this Court's recommendation that the District Court grant summary judgment on Plaintiff's breach of contract claim in its entirety.

### B. Plaintiff's Extra-Contractual Claims

Under Texas law, "[w]hen the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) (citing *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005) (per curiam)). This principle applies to alleged violations of the Texas Insurance Code, the Deceptive Trade Practices Act, and the common law duty of good faith and fair dealing. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 490 (Tex. 2018) ("The general rule is that an insured cannot recover policy benefits for an insurer's statutory violation if the insured does not have a right to those benefits under the policy."); *Hamilton Props. v. Am. Ins. Co.*, 643 Fed. App'x 437, 442 (5th Cir. 2016) (per curiam) (explaining that plaintiffs cannot prevail on "extra-contractual claims for violation of the Texas Deceptive Trade Practices Act, Sections 541 and 542 of the Texas Insurance

---

[196] The Court will note that the SOFA does not represent extrinsic evidence of New York Inn's prior income that could support a greater calculation of BI Loss in this case. *See, e.g.*, ECF No. 33 in Case No. 21-30958 (Bankr. N.D. Tex. 2021). Rather, it contains a basic representation (without supporting documentation) by Mr. Patel of New York Inn's gross operating revenue for the year it was filed and the two years prior.

Code, and the duty of good faith and fair dealing" absent a showing that an insurer breached its contract with the insured).

In *Meisenheimer v. Safeco Ins. Co. of Ind.*, for instance, the Judge Lynn explained that if the insurer did not breach its contract with the insured, the insured could not maintain extracontractual claims for breach of the duty of good faith, violations of the Texas Insurance Code and DTPA without establishing an "independent injury." No. 3:17–CV–2153–M, 2018 WL 3869573 at *3–4 (N.D. Tex. Aug. 15, 2018) (Lynn, J.). This "independent injury" exception to the general extracontractual claims rule is applied when an insurer commits an act, so extreme, that would cause injury independent of the policy claim. Under this exception, a plaintiff may recover damages inflicted by a statutory violation "only if the damages are truly independent of the insured's right to receive policy benefits," and not "predicated on [the loss] being covered under the insurance policy." *Menchaca*, 545 S.W.3d at 499–500 (quoting *Boyd*, 188 S.W.3d at 920) (alteration in original); *see also In re State Farm Mut. Auto Ins. Co.*, 629 S.W.3d 866, 874 (Tex. 2021) ("In other words, to recover under an independent-injury theory, the insureds must establish that [the insurer]'s statutory violations caused an injury apart from [the insurer]'s failure to pay as much as the insureds believe they should have been paid under their [ ] policies.").

The Plaintiff does not argue that it endured an injury independent of its contractual claims, nor does it cite to any evidence or authority that would establish such. Instead, Plaintiff's arguments in support of its extra-contractual claims presuppose success on its contractual claims. As that is not the case here, and the Plaintiff has not directed the Court to any evidence of an injury independent of its contractual claims, it is the recommendation of this Court that the District Court grant summary judgment on Plaintiff's extra-contractual claims.

### C. Reformation of Contract

In its Amended Complaint and the Response to the MSJ, the Plaintiff requests that the Court ***reform*** the Policy to include New York Inn as an additional insured "without limitation to simply general liability," thereby ***declaring*** New York Inn's right to bring a breach of contract claim.[197] This Court already dismissed the Plaintiff's cause of action for declaratory judgment in its Dismissal Order because the relief requested by the Plaintiff is not available under the Declaratory Judgment Act.[198] As such, the Court will only consider Plaintiff's arguments for its cause of action for reformation of contract, the arguments for declaratory judgment having been mooted by this Court's prior order.

In its Amended Complaint, the Plaintiff alleges that there was an agreement between AIIC, Viva Inn, and New York Inn to include New York Inn as an additional insured on the Policy without limitation, but that either a unilateral mistake was made by AIIC or a mutual mistake occurred if AIIC attempted to verify the agreement and Viva Inn and New York Inn overlooked that attempt.[199] The result of the mistake, Plaintiff alleges, was that Plaintiff had clean hands in requesting the addition of New York Inn as an additional insured, and the intentions of the Parties was not properly effected by the Policy's limitation of New York Inn to coverage for commercial liability only.[200]

Defendant cites to the Texas Supreme Court for the proposition that contracts "are presumed to reflect the intent of the contracting parties and are generally enforced as written," regardless of whether "one party puts himself in a bind as a result."[201] Defendant argues that its

---

[197] *See* ECF No. 49, pp. 18–19; *see also* ECF No. 81, pp. 38–41.
[198] *See* ECF No. 106, pp. 13–15.
[199] *See* ECF No. 49, pp 18–19.
[200] *See id.*
[201] *See* ECF No. 72, p. 31 (citing to *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014)).

Policy, as written, fully represents its intentions, and that although Plaintiff may allege that Viva Inn intended for New York Inn to be added as an additional insured for each coverage provision, Defendant posits that Plaintiff can cite to no evidence that shows that AIIC ever understood or intended that result.[202]

In its Response, Plaintiff argues that reformation is an available remedy in the instant case because one party made a unilateral mistake, which was accompanied by fraud on behalf of AIIC, when it knowingly agreed to the addition of New York Inn while limiting coverage.[203] Under Texas law, in order for a unilateral mistake to be considered grounds for reformation of a contract, the plaintiff must show that it made a mistake that was accompanied by or attributable to the fraud of another party to that contract. *See Conn v. Hagan*, 55 S.W. 323, 339 (Tex. 1900); *Warren v. Osborne*, 154 S.W.2d 944, 946 (Tex. App.– Texarkana 1941, writ ref'd w.o.m.) ("Knowledge by one party of the other's mistake regarding the expression of the contract is equivalent to mutual mistake."). However, as Defendant aptly notes in its Reply, Plaintiff cites to no evidence that supports its argument that AIIC had knowledge of the fact that Viva Inn intended for New York Inn to be added as an additional insured without limitation.[204] As such, in consideration of the record before the Court and the arguments of the Parties on this matter, the Court believes that no reasonable juror could conceivably find for Plaintiff on its cause of action for reformation of contract, and the Court hereby recommends that the District Court grant summary judgment

---

[202] *See id.* at 33–34, ¶¶ 3.28–29.

[203] *See* ECF No. 81, p. 39, ¶¶ 109–110.

[204] Plaintiff does not cite to any summary judgment evidence in support of its arguments for reformation of contract. In the factual background of the Response, Plaintiff does cite to an e-mail exchange as evidence of Viva Inn's request for AIIC to add New York Inn as an additional insured on the Policy. *See* ECF No. 81-1, pp. 238–41. Plaintiff also cites to a separate e-mail exchange about a prior claim to AIIC for roof repair as evidence that AIIC knew that New York Inn was the owner of the Property. *See id.* at 242–43. Yet neither of these exhibits demonstrate any fact indicating that AIIC knew that Viva Inn wished New York Inn to be listed as an additional insured on each coverage under the Policy, nor could these exhibits conceivably be used as evidence of fraud on behalf of AIIC without first showing such knowledge.

thereon. Moreover, the reformation claim is itself a red herring. AIIC has not denied any portion of Viva Inn's claim under the Policy on the basis that it does not own the Property. No substantive rights of Viva Inn (which is under the same ownership as New York Inn) would be affected by the dismissal of the cause of action for reformation of contract.

## VI.      CONCLUSION

In summary, although the Plaintiff alleged in its Amended Complaint that AIIC breached the Policy by refusing to pay additional benefits for building repairs, business interruption, and contents loss, the Defendant has fulfilled its burden to show that it sufficiently complied with the terms of the Policy and applicable state law in its handling of the Freeze Claim. Further, the Plaintiff has not directed the Court's attention to any summary judgment evidence that demonstrates the existence of any material issue of fact for trial on the Plaintiff's breach of contract claim. In addition, the Plaintiff's extra-contractual claims fail as a matter of law, as it has failed to plead an injury independent of its contractual claims, nor has it shown the Court any evidence or authority that could establish such. Finally, Plaintiff's cause of action for reformation of contract also fails, as Plaintiff fails to point to any evidence that shows AIIC ever knew that Viva Inn intended for New York Inn to be listed as an additional insured for all purposes on the Policy, an essential element of that cause of action. Accordingly, the Court respectfully recommends that the District Court grant the Motion in its entirety.

**###END OF REPORT AND RECOMMENDATION###**